Volvo Grp. N. Am. v. Roberts Truck Ctr., Ltd., 2020 NCBC 73.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 2981

VOLVO GROUP NORTH AMERICA,
LLC d/b/a VOLVO TRUCKS NORTH
AMERICA, a Delaware limited liability
company; and MACK TRUCKS, INC., a
Pennsylvania corporation,

Plaintiffs,

v.

ROBERTS TRUCK CENTER, LTD., a
Texas limited partnership; ROBERTS
TRUCK CENTER OF KANSAS, LLC, a
Kansas limited liability company; and
ROBERTS TRUCK CENTER
HOLDING COMPANY, LLC, a Texas
limited liability company,

Defendants.

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.      THIS MATTER is before the Court on Plaintiff Volvo Group North America, LLC d/b/a Volvo Trucks North America's ("Volvo") Motion for Summary Judgment ("Volvo Motion"), (ECF No. 103), and Defendants Robert Truck Center, Ltd., Roberts Truck Center of Kansas, LLC, and Roberts Truck Center Holding Company, LLC's ("Defendants" or "Roberts") Motion for Partial Summary Judgment ("Roberts Motion"), (ECF No. 108). After considering the Motions, the briefs in support of and in opposition to the Motions, and the arguments of counsel at a hearing held on August 18, 2020, for the reasons discussed below, the Court GRANTS the Volvo Motion and DENIES the Roberts Motion, as a result of which all claims and

counterclaims in the action are resolved, Volvo is entitled to terminate the Roberts'
Volvo dealership, and Roberts' Counterclaims are DISMISSED WITH PREJUDICE.

> *Kilpatrick Townsend & Stockton LLP, by Chad D. Hansen & Richard Keshian, and Baker Hostetler, LLP, by Billy M. Donley, James Keith Russell, and William Geise, for Plaintiffs Volvo Grp. N. Am., LLC d/b/a Volvo Trucks N. Am. & Mack Trucks, Inc.*

> *Johnson, Hearn, Vinegar & Gee, PLLC, by Richard Vinegar, and Hiersche, Hayward, Drakeley & Urbach, P.C., by Laurie Patton & James Drakeley, and Barnes Law Offices, LLC, by Patrick R. Barnes, for Defendants Roberts Truck Ctr. of Kansas, LLC, Roberts Truck Ctr. Ltd., & Roberts Truck Ctr. Holding Co., LLC.*

Gale, Judge.

## I.    MATTER BEFORE THE COURT

2.    This litigation arises from Plaintiffs' effort to terminate Roberts' Kansas dealerships following Roberts' failure to meet sales targets mandated by a Settlement Agreement, effective as of January 13, 2016, between the parties that was entered to resolve pending Kansas administrative proceedings Roberts brought to challenge the proposed termination.  The Settlement Agreement provided that Plaintiffs could terminate Roberts' dealerships if Roberts did not meet sales quotas specified in the Settlement Agreement.

3.    On April 8, 2020, the Court issued an Order and Opinion granting Mack Truck, Inc.'s Motion for Judgment on the Pleadings, but denying Volvo's Motion for Judgment on the Pleadings, finding that the Court could not on the pleadings alone resolve the parties' dispute as to the 2017 sales quota against which Roberts' performance would be measured for purposes of determining Volvo's right to terminate.  (Order & Op. on Pls.' Mot. J. Pleadings & Mot. Dismiss Countercls.,

("April 8, 2020 Order & Opinion"), ECF No. 90.) In particular, to determine the 2017 sales quota, the Court must resolve whether 5 sales to Schock Truck Leasing, Inc. ("Schock Leasing") qualify as "sales" as defined by the Settlement Agreement. The Court severed that issue for early determination. If the issue is resolved in Volvo's favor, it should be allowed to terminate without the need for further consideration of Roberts' counterclaims. If the issue is resolved in Roberts' favor, the Court must proceed in determining whether Roberts' failure to meet its sales quota resulted from Volvo's failure to meet its own obligation to provide adequate inventory.

4.      The parties now bring cross-motions for summary judgment on that issue. The Court does not repeat but adopts and incorporates the statement of facts and procedural history from its April 8, 2020 Order & Opinion, and recites any additional facts necessary to resolve the pending cross-motions in the body of its analysis below. Before doing so, it highlights facts which frame the contested issue.

## II.    THE MATERIAL ISSUE

5.      Roberts' pleadings project that it could have sold a maximum of 49 Volvo trucks had Volvo provided adequate inventory.

6.      While denying Roberts' allegations, Volvo contends that even if those sales are assumed, Volvo is entitled to terminate because the controlling 2017 sales quota Roberts was required to meet was 51. Roberts contends rather that its 2017 quota was no greater than 48, and more appropriately 46.

7.      The Settlement Agreement provided an initial Volvo quota of 27 truck sales for 2016 and 48 truck sales for 2017, with the 2017 quota to be adjusted based

on 2016 sales. The Settlement Agreement expressly provided that the shortage of sales in 2016 against quota would be added to the initial 2017 quota. The Settlement Agreement is silent as to whether 2016 sales in excess of the 2016 quota would reduce the 2017 quota.

8. Volvo contends that Roberts had 24 sales that qualify against its 2016 quota of 27 sales, so that the initial 2017 sales quota of 48 was adjusted upward to 51. Roberts contends that it had 29 sales against its 2016 quota of 27, so that the 2017 quota should be reduced to 46, or at a minimum remain at 48.

9. These contrasting positions depend on whether 5 sales made in 2016 to Schock Leasing should be counted as "sales" either because they meet the definition of a "sale" in the Settlement Agreement or Volvo and Roberts reached a separate binding agreement to count them even though they did not meet the definition in the Settlement Agreement.

10. Additional facts regarding how these sales should be treated are discussed in the Court's analysis below.

### III.   STANDARD OF REVIEW

11. In ruling on a motion for summary judgment under Rule 56(c) of the North Carolina Rules of Civil Procedure, the Court will grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c).

12. "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). The movant may make the showing required for summary judgment by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Id.* (citation omitted). The Court must take all facts asserted by the nonmoving party as true, and view all inferences from those facts in the light most favorable to that party. *Id.*

## IV. ANALYSIS

13. The Settlement Agreement provides that Roberts' compliance with its sales obligations is to be measured "strictly on the terms and conditions set forth herein." (Settlement Agreement ¶ 3, ECF No. 8.) It further provides:

> Only those trucks that are sold by Roberts, delivered to the customer, and warranty registered by the last date of each year qualify as a "sale" for purposes of determining whether Roberts achieves the agreed sales numbers set forth above. Further, only those sale made within Roberts' area of responsibility as set forth in Addendum 3 to each of the Dealer Agreements ("AOR") or to an customer outside Roberts' AOR that has not registered Volvo or Mack trucks within the previous three years qualify as a "sale" for purposes of determining whether Roberts achieves the agreed sales numbers as set forth above.

(Settlement Agreement ¶ 3.)

14. Although the Dealer Agreement defined Roberts' AOR, the Settlement Agreement did not specify a method for determining whether any sale was within that AOR.

15.     Roberts' Volvo AOR consisted of 29 Kansas counties.  Wichita, Kansas is within Roberts' AOR.  Kansas City, Kansas is not. (Aff. David Winner ¶ 3, ("5/28/20 Winner Aff."), ECF No. 105; Aff. Justin Fink ¶ 18, ("6/16/20 Fink Aff."), ECF No. 109.)

16.     The sales to Schock Leasing were warranty registered on October 26, 2016 using Schock Leasing's Kansas City, Kansas address.  (5/28/20 Winner Aff. ¶ 4; 6/16/20 Fink Aff. ¶ 19.)

17.     Schock Leasing had purchased Volvo trucks in the three years preceding Roberts' October 2016 sales to Schock Leasing.  (5/28/20 Winner Aff. ¶ 4.)

18.     Roberts contends, and the Court assumes for purposes of this Order and Opinion, that Roberts has now proven by affidavit that Roberts sold the 5 units to Schock Leasing in October 2016; that Volvo delivered the 5 trucks to Roberts' dealership facilities; that the trucks were delivered to Schock Leasing in Wichita, Kansas; that Schock Leasing leased the trucks to its customer Quikrete, which operated in Wichita, among other locations; and that in October 2016  Schock Leasing maintained some shop or facility in Wichita and took the 5 trucks to that location following Roberts' delivery of the trucks in order to prepare them for delivery to Quikrete.  (6/16/20 Fink Aff. ¶ 19; Aff. Kevin Hooper ¶¶ 2–6, ("5/27/20 Hooper Aff."), ECF No. 110.)[1]   The Court does not, however, assume that Roberts provided Volvo proof of such facts prior to June 17, 2020.

---

[1] Roberts relies heavily on the affidavit of Kevin Hooper who in 2016 worked for Schock Leasing at a shop in Wichita, Kansas.  Volvo notes that the Hooper affidavit neither says these specific 5 trucks were, in fact, leased to Quikrete or, if leased, were used by Quikrete within Roberts' AOR.  For purposes of the Motions, the Court grants Roberts the inference that the 5 specific trucks were, in fact, leased to Quikrete and that Quikrete has operations

19.     Schock Leasing dictated how the 5 trucks were to be titled and warranty registered.  With one exception, all related paperwork regarding the sales lists Schock Leasing's address in Kansas City, Kansas.  One handwritten reference to a Wichita address was stricken and replaced by the Kansas City address.  (Pl. Volvo's Resp. in Opp'n to Defs.' Mot. Partial Summ. J. 13–15, ECF No. 113 (citing to Roberts' production of deal documentation).)

20.     The Settlement Agreement does not expressly provide that a qualifying sale must be warranty registered at an address within Roberts' AOR.  However, as Schock Leasing had purchased Volvo trucks in the 3 years preceding the Settlement Agreement, the 5 sales to Schock Leasing in question qualify as 2016 sales under the Settlement Agreement only if they were sales "within Roberts' area of responsibility."

21.     Volvo urges that the record manifests that both Volvo and Roberts understood that the Schock Leasing sales were outside of Roberts' AOR.  First, Volvo contends that it is industry practice to rely on Polk data to determine whether sales are inside or outside of a dealer's AOR, Polk bases it determination on the address at which a truck is registered, and that the Settlement Agreement should be read against this common understanding and practice.

22.     However, Volvo also relies on correspondence between the parties that reflects an understanding and acceptance that the Schock Leasing sales did not qualify under the Settlement Agreement, and that Volvo made a conditional offer to count them nonetheless, but only if Roberts' submitted additional proof and only after

that included, but were not limited to, Roberts' AOR.  The evidence does not compel a conclusion that Quikrete used the specific trucks within Roberts' AOR.

the parties had agreed that Roberts' 2017 sales quota had been adjusted from 48 sales to 51 sales.

23.     Settlement agreements, such as the one reached by the parties in this case, "are governed by general principle of contract law." *Chappell v. Roth*, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2000).

24.     The Court is guided by the parties' intent when interpreting the meaning of words used in their agreement. *See State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) (citing *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973) ("Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution."); *see also Stanley v. Cox*, 253 N.C. 620, 635, 117 S.E.2d 826, 836 (1960) (citation omitted) ("Agreements must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, gathered from the language employed by them[.]").

> [T]he goal of construction is to arrive at the intent of the parties when the [contract] was [written]. Where a [contract] defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect. . . . [I]f the meaning of the [contract] is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

*Gaston County Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299–300, 524 S.E.2d 558, 563 (2000) (citations omitted).

25.     In determining the intent of the parties, the Court considers "all the surrounding circumstances," particularly "the construction which the parties have placed on the language" of the agreement prior to the dispute, *Century Commc'ns, Inc. v. Housing Authority of Wilson*, 313 N.C. 143, 146, 326 S.E.2d 261, 264 (1985), as well as the nature of the agreement, "the condition of the parties executing it, and the objects they had in view." *Jones v. Casstevens*, 222 N.C. 411, 414, 23 S.E.2d 303, 305 (1942) (citation omitted).  The Court may also consider the construction placed on such words after the agreement was entered.  *Davis v. McRee*, 299 N.C. 498, 502, 263 S.E.2d 604, 607 (1980) (citing *Preyer v. Parker*, 257 N.C. 440, 446, 125 S.E.2d 916, 920 (1962)) ("The parties are presumed to know the intent and meaning of their contract better than strangers, and where the parties have placed a particular interpretation on their contract after executing it, the courts ordinarily will not ignore that construction which the parties themselves have given it prior to the differences between them.").

26.     The Court then considers the statements and conduct of the parties against these standards of construction.

27.      There is pertinent correspondence between David Winner ("Winner"), Volvo's Senior Vice President of Distribution Development, (5/28/20 Winner Aff. ¶ 1), and Justin Fink ("Fink"), Chief Executive Officer of Summit Truck Group of Roberts Truck Centers, (6/16/20 Fink Aff. ¶ 1).  Winner and Fink corresponded on multiple occasions regarding whether Roberts had met the sales quotas established by the Settlement Agreement.

28. On April 4, 2017, Winner wrote Roberts' Dealer Principal, Blair Roberts, with a copy to Fink, summarizing Roberts' 2016 sales and how the 2017 sales quota must be adjusted from 48 to 51 because of a shortfall of 3 sales against the Roberts' 2016 quota. (5/28/20 Winner Aff. Ex. 1, ("4/4/2017 E-mail Chain"), ECF No. 105.1.) Winner reported Roberts' Volvo sales as a total of 24 qualifying sales, only 8 of which were made within Roberts' AOR but were qualified for other reasons. (4/4/2017 E-mail Chain.) In doing so, Winner considered the Schock Leasing sales as having been made at the place of warranty registration in Kansas City, outside of Roberts' AOR. Fink responded to Winner on April 26, 2017, requesting that Volvo take a "re-look" at the sales to Schock Leasing, stating, "[a]lthough they are technically based in KC, these guys have bought trucks from us for years and we were thinking they should count." (4/4/2017 E-mail Chain.)

29. On October 11, 2017, Fink wrote Winner, agreeing that the 2017 Volvo sales goal was 51 units, expressly approving a chart Winner provided to Fink on September 19, 2017, with a stated objective of 51 Volvo truck sales for 2017, expressed as "Req. Sales 51 (48+3)." (5/28/20 Winner Aff. Ex. 3, ("8/23/2017 E-mail Chain"), ECF No. 105.3; 5/28/20 Winner Aff. Ex. 4, ("10/11/2017 Fink E-mail"), ECF No. 105.4.) Fink stated, "[w]e understand and agree with the **'Req Sales'** columns" stated in Winner's chart. (10/11/2017 Fink E-mail (emphasis in original).)

30. Winner and Fink met on March 5, 2018 to discuss Roberts' performance against its 2017 sales quota. (5/28/20 Winner Aff. Ex. 2, ("3/7/2018 E-mail Chain"), ECF 105.2.) On March 7, 2018, Fink wrote Winner again suggesting that the Schock

Leasing sales should be counted, stating, "These 5 trucks are leased by Schock to a company called QuikCrete [sic], all running and domiciled in the Wichita area." (3/7/2018 E-mail Chain.)  Winner responded on March 16, 2018 as follows:

> These 5 sales do not qualify as "sales" under the settlement agreement because Schock Leasing is not within the AOR and is not a conquest customer.  You told me that Schock Leasing's customer is QuikCrete [sic] which is headquartered within the AOR.  Please provide me with records to demonstrate that the trucks were leased to QuikCrete [sic] in Wichita, delivered, and warranty registered in 2017.  Based on your representation that the ultimate customer is within the AOR, Volvo Trucks will credit these 5 sales toward the **2017** agreed sales number, provided that they were actually leased to QuikCrete [sic].  Attached is a revised version of the summary chart . . . which shows that, even with the 5 sales to Schock Leasing, Roberts still falls far short of the 2017 agreed sales number for Volvo Trucks (51 sales required; 27 sales made).

(3/7/2018 E-mail Chain.) (emphasis added)

31.    Fink understood that Winner's offer was conditioned on Roberts' submitting additional proof.  On March 23, 2018, Fink agreed to supply the requested information to Winner.  When doing so, Fink again expressed no disagreement that Roberts' 2017 quota had been adjusted to 51.  (3/7/2018 E-mail Chain.)

32.    Winner stated in his May 28, 2020 affidavit that Volvo was withdrawing its conditional offer to credit the Schock Leasing sales and that as of that date Roberts had not provided the information which Fink promised and on which the offer was conditioned.  (5/28/20 Winner Aff. ¶ 13.)

33.    The affidavit from Schock Leasing's employee Kevin Hooper detailing the delivery of the 5 trucks to Schock Leasing's Wichita shop was not provided to Volvo until June 17, 2020.  (*See* 5/27/20 Hooper Aff.)

34.     Fink also filed an affidavit on June 17, 2020, in which he states that "Winner agreed to credit 5 additional Volvo sales to Schock Leasing, as we are able to prove they are in our AOR." Fink then sought to apply the credit to Roberts' 2016 quota, so that "[t]his brings our total units sold for 2016 to 29." (6/16/20 Fink Aff. ¶ 6.) If correct, there would be no shortfall of sales against Roberts' 2016 quota and the 2017 sales quota would not have been adjusted upward from the initial stated 48 sales. There is no evidence that Fink had ever advised Volvo prior to this affidavit that Roberts did not accept a 2017 quota of 51 sales.

35.     Roberts has presented no forecast of evidence that it had by May 28, 2020 provided Volvo with the information Fink had promised to deliver to Winner and on which Volvo's offer was conditioned. To the contrary, Fink testified that Roberts had been unable to provide the requested information until it had obtained the additional information provided by Kevin Hooper's affidavit filed with the Court on June 17, 2020. (6/16/20 Fink Aff. ¶ 22.)

36.     Fink nevertheless asserts in his affidavit that Roberts had maintained records that it needed 46 Volvo truck sales to meet its 2017 sales quota under the Settlement Agreement. (6/16/20 Fink Aff. ¶ 7.) This contention is expressly at odds with Fink's correspondence in 2018 acknowledging that Winner had correctly stated a 2017 quota of 51 sales.

37.     There is no language within the Settlement Agreement that allows for a construction that the sales of the 5 trucks ordered by and delivered to Schock Leasing should be considered instead as sales to Quikrete. Rather, Fink requested

that Winner *construe* the sales to Schock Leasing as the equivalent of sales to Quikrete because Quikrete intended to use the trucks within Roberts' AOR. Ultimately, Volvo never agreed to credit the sales to Quikrete.

38.    Based on the language of the Settlement Agreement and the correspondence between the parties, the Court concludes that the parties understood and intended that sales to Schock Leasing would be considered sales outside of Roberts' AOR, and that those sales would only be credited if Volvo agreed to credit them by separate agreement notwithstanding the restrictions of the Settlement Agreement.

39.    The Court accordingly concludes that the undisputed record demonstrates that the 5 sales to Schock Leasing in dispute were not qualifying sales within Roberts' AOR.

40.    The Court concludes that Volvo was entitled to withdraw its conditional offer to count the Schock Leasing sales at a time before the offer had been accepted in accordance with its terms, and that Volvo withdrew its conditional offer before Roberts accepted the offer by satisfying the conditions.

41.    Alternatively, the Court concludes that Roberts has yet to demonstrate concrete proof that the trucks sold to Schock Leasing were actually used by Quikrete within Roberts' AOR.

42.    The Court concludes that the record clearly demonstrates that any sale by Roberts would not be considered a sale within its AOR simply because the order

had been placed at or the truck had been delivered at Roberts' Wichita, Kansas facility. The course of conduct is to the contrary.

43. Roberts agreed that the Settlement Agreement should be construed strictly.

44. The record is undisputed that Roberts did not meet its 2016 Volvo sales quota unless the 5 sales to Shock Leasing are credited against that quota.

45. Because those sales cannot be credited against the 2016 sales quota consistent with the requirements of the Settlement Agreement, Roberts had a shortfall of 3 sales from its 2016 sales quota. That shortage of 3 sales then required that Roberts' 2017 sales quota should be increased to 51.

46. Roberts has neither provided nor forecasted that it has sold or would have been capable of selling 51 Volvo units in 2017.

47. Roberts failed to meet its 2017 Volvo sales quota. Volvo is therefore entitled to terminate Roberts' Volvo dealership in accordance with the terms of the Settlement Agreement.

48. As Roberts has contended that it would have made at most a total of 49 sales of Volvo units in 2017 had Volvo supplied it full inventory, the Court need not determine whether Roberts can by its counterclaim prove that, in fact, Volvo failed in its obligation to provide inventory so that it should be estopped from terminating Roberts' dealership.

# V. CONCLUSION

49. For the foregoing reasons, the Court CONCLUDES, FINDS, and ORDERS that:

    a.    Volvo's Motion for Summary Judgment is GRANTED;

    b.    Roberts' Motion for Partial Summary Judgment is DENIED;

    c.    Volvo is entitled to proceed with its termination of Roberts' dealership, upon the expiration of the stay provided by the Consent Order entered on May 29, 2020, (ECF 107);

    d.    Roberts' counterclaims are DISMISSED WITH PREJUDICE;

    e.    Accordingly, this Order and Opinion resolves all remaining claims in the litigation and constitutes a "final judgment" as defined by the Consent Order entered on May 29, 2020.

    f.    Each party should bear its own costs and fees.

IT IS SO ORDERED this the 14th of October, 2020.


                   /s/ James L. Gale
                   James L. Gale
                   Senior Business Court Judge